T.C. Memo. 1997-53

UNITED STATES TAX COURT

ESTATE OF W. CLYDE WRIGHT, DECEASED,
BRIAN R. WRIGHT, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2554-94.            Filed January 29, 1997.

<u>Philip J. Kramer</u>, for petitioner.

<u>Raymond M. Boulanger</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined a deficiency of
$2,275,040 in the Federal estate tax of the Estate of W. Clyde
Wright (decedent).

Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect on April 20, 1990, the date

of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement, the sole issue for decision is the value, as of October 20, 1990 (the alternate valuation date), of 201,408 shares of common stock of the Wilber Corp. (Wilber Corp).

## FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

At the time of decedent's death, decedent resided in Otsego County, New York. At the time the petition was filed, the executor resided in Vestal, New York. Petitioner opted to use the alternate valuation date of October 20, 1990, for purposes of valuing decedent's stock in Wilber Corp.

At the time of his death, decedent owned 201,408 shares or 23.8 percent of the total 847,524 shares of common stock of Wilber Corp. Wilber Corp holds 100 percent of the common stock of Wilber National Bank (Wilber Bank or the bank). Wilber Bank is a federally chartered bank. Wilber Corp's stock is not listed on any stock exchange but is traded infrequently on the over-the-counter market.

The following schedule identifies, as of October 20, 1990, the 10 largest shareholders of Wilber Corp, and for each shareholder the number and percentage of shares owned:

| 10 Largest Shareholders of Wilber Corp | Number of Shares Owned | Percentage of Total Shares |
|---|---|---|
| Estate of W.C. Wright | 201,408 | 23.8 |
| David Wilber | 80,000 | 9.4 |
| Farone Foundation Trust | 78,000 | 9.2 |
| Magdeline Farone Trust | 36,764 | 4.3 |
| Anna Farone Trust | 36,764 | 4.3 |
| Jesuits of Holy Cross | 31,412 | 3.7 |
| Sterling Harrington | 30,872 | 3.6 |
| Shearson Lehman Hutton | 16,624 | 2.0 |
| Ruth Fox Trust | 12,804 | 1.5 |
| Brian R. Wright | 12,592 | 1.5 |
| Total | | 63.3 |

As of October 20, 1990, all of the above shareholders had held their shares of stock in Wilber Corp for many years.  The shareholders in Wilber Corp not identified in the above schedule were apparently employees who, over the years, were given a few shares of stock or local investors and charitable trusts that, over the years, had obtained a few shares of stock.

Wilber Bank was formed in the 1870's as a community bank in Oneonta, New York.  Wilber Bank has had a strong performance record, relying mainly on the local, rural economy for its business.  Wilber Bank's business consists primarily in making agricultural, consumer, and real estate loans, and in providing typical banking services to small businesses and individuals.

During the 1970's, in an unsuccessful attempt to acquire control of Wilber Bank, the Bank of New York made a tender offer for all of the shares of stock of Wilber Bank well above book

value of the shares and above the over-the-counter price of the shares.

During the 1980's, Wilber Bank developed a strong loan portfolio. From the mid-1980's through September of 1990, Wilber Bank's total assets steadily increased, and, overall, profitability remained constant.

In February of 1990, the shares of stock in Wilber Corp were split 4-to-1 and increased dividends were declared on the shares. Also in 1990, while much of the Nation's banking industry was experiencing an economic downturn due to the savings and loan crisis, Wilber Bank expanded its activity in the Oneonta region by acquiring two branches of another local bank.

As of September 30, 1990, Wilber Bank held assets totaling $284,590,000.

Approximately 10,000 shares of common stock of Wilber Corp were traded each year on the over-the-counter market. Generally, no blocks of Wilber Corp stock larger than 500 shares were ever traded, and the small number of shares of stock in Wilber Corp that traded in the month of October of 1990 traded at an average sales price of $50 per share. On or about October 20, 1990, there existed a waiting list of perhaps 50 investors who were interested in acquiring shares of stock in Wilber Corp.

Wilber Corp's articles of incorporation state that no merger, consolidation, dissolution, or sale of all or of

substantially all of the assets of the corporation may occur without approval of at least 66 2/3 percent of the shareholders.

On January 20, 1991, petitioner timely filed decedent's Federal estate tax return, and, for purposes of valuing the 201,408 shares of stock in Wilber Corp that decedent owned as of the date of his death, petitioner elected to use on the estate tax return the alternate valuation date of October 20, 1990. Petitioner attached to the Federal estate tax return a letter prepared by Alex Sheshunoff & Co., Inc. (petitioner's first expert), a national investment banking firm that maintains a division specializing in the appraisal of banks and bank stock, in which this expert valued decedent's 201,408 shares of stock in Wilber Corp, after discounting for various factors, at $7,653,504, or $38 per share.

On audit, respondent obtained an appraisal of decedent's 201,408 shares of stock in Wilber Corp from Business Valuation Services, Inc. (BVS). Respondent's expert considered the same basic factors used by petitioner's expert but applied a control premium, valuing decedent's 201,408 shares of stock in Wilber Corp at $13,562,815, or $67.34 per share.

OPINION

Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having

reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); Collins v. Commissioner, 3 F.3d 625, 633 (2d Cir. 1993), affg. T.C. Memo. 1992-478; Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989); sec. 20.2031-1(b), Estate Tax Regs. The question of fair market value involves a question of fact, and the trier of fact must weigh all relevant evidence and draw appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982).

In valuing shares of stock, the price at which shares are sold, on a stock exchange, in an over-the-counter market, or otherwise, is often the best evidence of the value. Dellacroce v. Commissioner, 83 T.C. 269, 288 (1984); Estate of Damon v. Commissioner, 49 T.C. 108, 115 (1967); sec. 20.2031-2(b)(1), Estate Tax Regs.

In addition to the selling price of shares of stock, other factors and elements of value are often considered, particularly where stock of a nonpublicly traded company is being valued. Estate of Gilford v. Commissioner, 88 T.C. 38, 49 (1987); sec. 20.2031-2(e), Estate Tax Regs. Additional factors that are relevant in valuing shares of stock include the following:

(1) The economic outlook in general and the condition and outlook of the specific industry;

(2) The book value of the stock and financial condition of the company;

(3) The earning capacity of the company;

(4) The dividend-paying capacity;

(5) Whether or not the enterprise has goodwill or other intangible value;

(6) The market price of shares of stock of companies engaged in the same or similar line of business;

(7) The company's net worth.

(8) The size of the block of stock to be valued.

See sec. 20.2031-2(f)(2), Estate Tax Regs.; Rev. Rul. 59-60, 1959-1 C.B. 237.

Petitioner's first expert rated Wilber Bank, in comparison to other U.S. banks with similar total assets, with respect to return on assets, return on equity, asset quality (specifically nonperforming loans), and liquidity, as indicated in the following schedule:

| Factors of Comparison | Rating of Wilber Bank Among U.S. Banks With Similar Total Assets | |
| --- | --- | --- |
| Return on Assets | Top | 4% |
| Return on Equity | Top | 21% |
| Nonperforming Loans | Bottom | 41% |
| Liquidity | Bottom | 31% |

In October of 1990, an independent report published by First Albany Corp. (First Albany report), a regional investment banking

company, rated Wilber Bank as having the highest estimated 1990 earnings per share and the second highest estimated 1990 dividend payment per share of any upstate New York commercial bank. Out of the upstate New York commercial banks, the First Albany report recommended that investors purchase shares of stock in four banks or bank holding companies, one of which was Wilber Corp.

In the instant case, shares of stock in Wilber Corp were traded in small quantities in the over-the-counter market on and around the valuation date, at a price of approximately $50 per share. Both parties' experts appear to have used this figure as a starting point in valuing decedent's 201,408 shares of stock in Wilber Corp.

Petitioner's first expert valued the shares of stock in Wilber Corp at $7,653,504, or $38 per share. Petitioner's expert utilized: (1) The comparable market approach to valuation, comparing Wilber Corp's book value, earnings per share, price-to-book-value ratio, adjusted book value, and adjusted earnings with those of similarly sized, publicly traded banks and bank holding companies, and (2) the income or investment value approach to valuation, calculating the net present value and future earnings of Wilber Corp and the return on investment using a 12-percent rate of return. Also, although the size of the block of stock was considered and taken into account in arriving at a value of $38 per share, petitioner's first expert testified that he did not factor in a specific and separate discount or premium

percentage to reflect the size of the block of stock to be valued.

For the 10 years subsequent to the valuation date, petitioner's first expert projected for Wilber Corp a low dividend yield, low asset growth, low net income growth, low return on average assets, and low return on average equity.

At trial, petitioner's second expert focused on the significant size of the block of stock to be valued, the limited type and number of investors that would be capable of purchasing the large block of stock (namely, banks and other financial institutions), and the regulatory restrictions that he believed would discourage such investors from purchasing the block of stock.

Petitioner's second expert opined that the October sales price of approximately $50 per share on the over-the-counter market did not accurately indicate the price that investors would pay for the shares of decedent's stock if all 201,408 shares became available at the same time. Petitioner's second expert concluded that the market could only absorb a sale of 15,000 to 20,000 shares of stock in Wilber Corp at the October sales price of approximately $50 per share, and that, within a reasonable period of time, the increased supply of shares would flood the market and cause the market price of the shares to decrease to perhaps as low as $34 per share.

Both of petitioner's experts opined that a control premium should not be applied to decedent's block of 201,408 shares because they believed that the shares (representing 23.8 percent of the stock in Wilber Corp) did not constitute a controlling interest.  Based on their valuations and on their analyses with respect to the number of shares to be valued, petitioner's experts concluded that, as of October 20, 1990, the value of the 201,408 shares of Wilber Corp's stock that were owned by decedent at the time of his death was $7,653,504, or $38 per share.

Respondent's expert relied primarily on a market transaction approach to valuation in concluding that, as of October 20, 1990, the value of decedent's shares of stock in Wilber Corp was $13,562,815, or $67.34 per share.  Respondent's expert acknowledged that, in October of 1990, the economy was in a recession and that in the Northeast region the economy was experiencing a particular downturn due to financial difficulties of its two primary industries, defense and finance.

With respect, however, specifically to the Oneonta, New York region, respondent's expert concluded that the region (because it was more rural and less tied to the defense and finance industries) was less likely to be affected by general economic difficulties of the Nation and of the Northeast region.

Respondent's expert concluded that petitioner's experts' valuations of the shares of stock in Wilber Corp were

unreasonably low and inconsistent with Wilber Corp's historically strong financial position.

Respondent's expert then relied heavily on a hypothetical scenario in which a single investor or group of investors (purchasers) might purchase decedent's entire block of stock (representing a 23.8-percent interest in Wilber Corp) and use this block of stock to force the Farone family trusts, the Jesuits of Holy Cross, other charitable trusts, and other current holders of shares of stock in Wilber Corp to sell their shares to the purchasers, enabling the purchasers to acquire at least 51 percent or effective control of Wilber Corp.  Because of respondent's expert's opinion that his hypothetical scenario had a realistic possibility of becoming a reality, respondent's expert opined that a conservative control premium of approximately 35 percent should be applied to the average over-the-counter sales price of $50 per share.  Finally, respondent's expert concluded that because the market for shares of stock in Wilber Corp was thin, not for lack of buyers, but for lack of willing sellers, the size of the block of stock should not be considered significant and no blockage discount should apply.

Although we conclude that petitioner's experts made unreasonably low projections regarding the future financial condition, profitability, and overall performance of Wilber Bank, we find petitioner's experts generally more credible and their

valuation methods and opinions more correct than those of respondent's expert.

Based simply on comparable market data used by each of the experts and in the First Albany report, the average market price of shares of stock in regional banks similar to Wilber Bank was approximately $22 per share.

With respect to respondent's expert's valuation, we find his comparable market analysis contradictory and the explanation thereof somewhat cursory. We do, however, agree with respondent's expert's opinion regarding his more positive picture of Wilber Bank's financial position. Although Wilber Bank did experience an increase in the amount of nonperforming loans in 1990, we are not convinced that such loans reflected for Wilber Bank a permanent downturn in profitability. In general, the shares of stock in Wilber Corp were in demand and the regional investment community regarded Wilber Corp to be in excellent condition.

In view, however, of the loyalties of the shareholders of Wilber Corp, we find respondent's scenario, in which hypothetical investors would purchase decedent's entire block of 201,408 shares of stock as well as an additional 27.2 percent of the shares and thereby gain a 51-percent controlling interest in Wilber Corp, an unlikely scenario unsupported by the facts.

In this case, there is no credible evidence that decedent's block of 201,408 shares of stock in Wilber Corp should be

considered part of a control group.  Also, respondent's expert, in concluding that decedent's 23.8-percent interest should somehow be treated as part of a hypothetical 51-percent controlling interest, effectively ignores the requirement present in Wilber Corp's articles of incorporation of a 66 2/3-percent super majority for decisions regarding the merger, consolidation, dissolution, or sale of all or substantially all of the assets of the bank.

Respondent argues that a control premium is justified, because decedent's block of stock arguably could control one member of the Board of Directors and thereby "substantially influence" corporate action and cause the sale of the bank. Before a control premium may be applied, however, something more than "substantial influence" is required.  See Estate of Newhouse v. Commissioner, 94 T.C. 193, 251-252 (1990).

Based on our analysis of petitioner's experts' opinions (implicitly reflecting a blockage discount), we use as our starting point the $38 per-share value calculated by petitioner's experts.  Adjusting upward this figure based on the excellent financial condition of Wilber Bank, and taking into account the $50 per-share average sales price of Wilber Corp stock in the thinly traded over-the-counter market, we conclude that on October 20, 1990, the value of the 201,408 shares of stock in Wilber Corp was $9,063,360, or $45 per share.

To reflect the foregoing,

- 14 -

Decision will be entered

under Rule 155.