T.C. Memo. 1999-342


UNITED STATES TAX COURT


ESTATE OF SAM HOMER MARMADUKE, DECEASED, JOHN H. MARMADUKE,
INDEPENDENT EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17047-97.          Filed October 14, 1999.


William R. Cousins III, Robert Don Collier, and Robert M. Bolton, for petitioners.

Audrey M. Morris, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  Respondent determined a deficiency of $1,809,921 in the Federal estate tax of the Estate of Decedent Sam Homer Marmaduke.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of September 7, 1993 (the

date of decedent's death or the valuation date), and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement of some issues, the sole remaining issue for decision is the fair market value, as of the date of decedent's death, of 366,385 shares of common stock of a closely held corporation.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time of decedent's death, decedent resided in Amarillo, Texas. At the time the petition was filed, John H. Marmaduke, the executor of decedent's estate, resided in Amarillo, Texas.

Upon his death in 1993, decedent owned 366,385 shares or approximately 22 percent of the total outstanding common stock in Hastings Books, Music & Video, Inc. (Hastings). Other members of the Marmaduke family owned another 957,685 shares or 57 percent of the total outstanding common stock in Hastings. Together, the Marmaduke family (including decedent's wife, children, and grandchildren) owned 79 percent of the total common stock in Hastings.

Shareholders unrelated to the Marmaduke family, comprising Hastings employees and a qualified employee benefit plan covering

Hastings employees (the ESOP), owned the remaining 21 percent of the total outstanding shares of common stock in Hastings.

The stock in Hastings is not listed on any stock exchange and is not traded over the counter.

As of the valuation date, Hastings was engaged throughout the Southern and Southwestern United States in the business of operating 103 retail stores that sold prerecorded music, books, and video cassettes.

Hastings was originally created in the 1960's as a retail subsidiary of Western Merchandisers, Inc. (Western).  Western, in turn, was a wholesaler and distributor of similar merchandise to stores such as Wal-Mart Stores, Inc. (Wal-Mart).  In 1991, Hastings was split off from Western in a tax-free reorganization. Following the reorganization, Western was sold to Wal-Mart, and Western's former shareholders held stock in both Hastings and Wal-Mart.  Pursuant to a 5-year branch service agreement, however, Hastings' management remained dependent upon Western's headquarters and distribution facilities, information systems, and accounting functions.

From the date of the 1991 reorganization until the valuation date of September 7, 1993, Hastings was in excellent financial condition with both sales and profits increasing significantly.

In January of 1993, A.G. Edwards & Sons, Inc. (A.G. Edwards), a valuation company, prepared a valuation report of the

fair market value of common stock in Hastings. The purpose of the A.G. Edwards' report was to establish the fair market value of an approximate 3-percent interest in Hastings common stock held by the ESOP plan. When ESOP plan participants purchased a new home, needed money for a child's education, or terminated employment, they had the right to direct the plan to sell shares of Hastings stock back to Hastings at the then current fair market value. This "put" option provided liquidity for small blocks of stock in Hastings held by the ESOP.

Before any discount for lack of marketability, the A.G. Edwards' report calculated the total value of Hastings as of January of 1993 to be $100 million. The A.G. Edwards' report then applied a 40-percent discount for lack of marketability that would have reflected a value for Hastings stock of $35.45 per share. However, due to the above-described liquidity of ESOP plan shares provided by the put option, the A.G. Edwards' report reduced the 40-percent lack-of-marketability discount in half to 20 percent and opined that the fair market value of Hastings stock held by the ESOP was $47 per share.

In 1993, 18 separate transactions involving small blocks of Hastings stock occurred between employees, officers, and other individuals with an ongoing relationship with Hastings or Western, cumulatively representing approximately 1 percent of the total issued and outstanding shares of stock in Hastings. All

but two of these transactions occurred at a price per share of $47.

In June of 1993, decedent sold 7,000 shares of his common stock in Hastings at $47 per share. Decedent sold 2,000 of these shares to an officer and treasurer of Western who possessed full knowledge of the financial affairs of Hastings. In November of 1993, petitioner, who is decedent's son and president and CEO of both Western and Hastings, sold 2,000 shares of his stock in Hastings at $47 per share.

On June 7, 1994, petitioner timely filed decedent's Federal estate tax return. Based on a valuation report of Gibbs, Smith & Schwartzman, a valuation company, the fair market value of decedent's 366,385 shares of stock in Hastings was reported on decedent's estate tax return at $13,384,044, or $36.53 per share.

On audit, based largely on the transactions in Hastings stock that occurred in 1993, respondent determined that the total fair market value of decedent's shares of stock in Hastings was $17,220,095, or $47 per share. Based thereon, respondent determined an increase in the value of decedent's gross estate of $3,836,050.

OPINION

For Federal estate tax purposes, property is generally included in a gross estate at its fair market value on the date

of death. See sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. See United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Brookshire v. Commissioner, T.C. Memo. 1998-365; sec. 20.2031-1(b), Estate Tax Regs.

Fair market value involves a question of fact, and facts reasonably known on the valuation date are particularly relevant. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 217-218 (1990); Estate of Brookshire v. Commissioner, supra. Arm's-length sales of stock within a reasonable time before and after the appropriate valuation date are strong indicators of fair market value. See Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Estate of Brookshire v. Commissioner, supra.

Additional factors that are relevant in valuing shares of stock in closely held corporations are: The financial condition of the corporation, the value of listed stock of corporations engaged in similar lines of business, the corporation's net worth, the size of the block of stock to be valued, and the earning and dividend paying capacity of the corporation. See Estate of Newhouse v. Commissioner, supra at 217-218; Estate of Hall v. Commissioner, 92 T.C. 312, 336 (1989); Estate of Wright

v. Commissioner, T.C. Memo. 1997-53; sec. 20.2031-2(f)(2), Estate Tax Regs.; Rev. Rul. 59-60, 1959-1 C.B. 237, 238-239.  Also, in valuing closely held corporations, discounts may be warranted to reflect the stock's lack of marketability and limitations on transferability.  See Estate of Newhouse v. Commissioner, supra at 249; Estate of Andrews v. Commissioner, supra at 953; Estate of Brookshire, supra.

We weigh expert witness testimony offered by the parties in light of particular facts and circumstances of each case.  See Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994); United Parcel Serv. of Am., Inc. v. Commissioner, T.C. Memo. 1999-268.

Petitioner's first expert, using a 60-percent discount for lack of marketability, values the shares of decedent's stock in Hastings at $9,210,000, or $25.15 per share.  Petitioner's first expert reached this opinion by:  (1) Using the guideline company method of valuation and comparing Hastings to several publicly traded corporations engaged in similar lines of business; (2) using the guideline merged-and-acquired company method and comparing similar corporations that were bought or sold within a reasonable time of the valuation date; and (3) using the discounted cash-flow method.  Due to alleged lack of independent bargaining and negotiations relating to the $47 price reflected

in the 1993 transactions involving Hastings stock, petitioner's first expert entirely rejects the transaction method.

Petitioner's second expert, using a 40-percent lack-of-marketability discount, values the shares of decedent's stock in Hastings at $12,658,602, or $34.55 per share. Petitioner's second expert relies solely on the guideline company and discounted cash-flow methods while rejecting the transaction and other valuation methods as inappropriate indicators of value.

Respondent's expert, using a 15-percent lack-of-marketability discount, values decedent's shares of stock at $17,220,095, or $47 per share. Respondent's expert utilizes the guideline company, the discounted cash-flow, and the transaction methods of valuation.

In the schedule below, we summarize the total equity value of the Hastings corporation, the discount for lack of marketability, and the per-share value of the Hastings stock as reflected in the 1993 A.G. Edwards' report and in the reports of the parties' expert witnesses. With regard to the A.G. Edwards' report, in the schedule we reflect separately the indicated value for the Hastings shares of stock owned in general and for those stocks held by the ESOP.[1]

---

1   At trial and on brief, neither party relies on the $36.53 per-share value of decedent's Hastings stock reflected on decedent's Federal estate tax return. Accordingly, we do not
(continued...)

| | A.G. Edwards General | A.G. Edwards ESOP | Petitioner's First Expert | Petitioner's Second Expert | Respondent's Expert |
|---|---|---|---|---|---|
| Equity Value | $100,000,000* | $100,000,000* | $106,000,000* | $97,740,000* | $115,175,500* |
| Discount | 40% | 20% | 60% | 40% | 15% |
| Value Per Share | $35.45 | $47 | $25.15 | $34.55 | $47 |

* Represents the approximate average equity value for Hastings from all methods utilized by each expert.

We conclude that the total equity value of Hastings was $100 million on the valuation date. This falls within the range for the estimated equity value of Hastings reflected in the reports of each of the experts and in particular is supported by the 1993 A.G. Edwards' report.

As indicated, in determining the fair market value of decedent's 366,385 shares of stock in Hastings, the parties' experts all agree that some discount reflecting lack of marketability is appropriate. They disagree, however, as to the percentage -- suggesting 15 to 60 percent.

With regard to the appropriate marketability discount for small blocks of stock in Hastings, the testimony of the officer and treasurer of Western is significant. He testified that $47 per share (reflecting a 20-percent discount) was a fair and accurate price for the 2,000 shares of stock he purchased from

(...continued)
reflect that valuation in the schedule, nor do we refer to it again in the opinion.

decedent shortly before the valuation date.  He stated that at no time was he under compulsion to buy or sell the shares of stock.

The value, however, of decedent's large, minority block of 366,385 shares of stock in Hastings is not controlled by the value of 2,000 shares nor by the other 1993 transactions involving small blocks of Hastings stock.  Respondent's expert relies heavily on transactions cumulatively representing less than 1 percent of Hastings common stock.  Decedent's stock, on the other hand, represents some 14 times the total number of shares of stock exchanged during 1993.

We note that the A.G. Edwards' report reduced the 40-percent discount for lack of marketability that it would use for Hastings stock in general to a 20-percent discount only because of the liquidity available to the Hastings stock held by the ESOP.

We regard a 15- or 20-percent lack-of-marketability discount as inadequate in valuing decedent's shares.  It is clear that decedent's large, minority block of Hastings stock was not readily marketable and that a significant lack-of-marketability discount is appropriate.  Several studies in evidence confirm that discounts for lack of marketability of stock in closely held corporations often exceed 30 percent.

In reaching our conclusion as to the appropriate lack-of-marketability discount to apply to decedent's stock in Hastings, we regard the following factors as supporting a significant

discount:  The lack of a ready market for the Hastings shares, the comparatively small size of prior transactions relative to the size of decedent's block of stock, the continued dependence of Hastings on the branch service agreement with Western, and the general credibility of the A.G. Edwards' report.

Other factors, however, also indicate to us a marketability discount considerably less than the 40- and 60-percent discounts suggested by petitioner's experts.  The several transactions of Hastings stock that did occur in 1993 at $47 per share were not in any way factored into the calculations of petitioner's experts, and Hastings was in excellent financial condition as of the valuation date.

Based on the evidence, we conclude that the appropriate discount for lack of marketability of decedent's 366,385 shares of common stock in Hastings is 30 percent.

Applying the 30-percent lack-of-marketability discount to the $100 million total equity value of Hastings yields a fair market value of $41.51 per share.  We conclude that, as of September 7, 1993, the value of decedent's 366,385 shares of common stock in Hastings was $15,208,641 ($41.51 times 366,385 equals $15,208,641).

To reflect the foregoing,

Decision will be entered under Rule 155.