T.C. Memo. 2019-101

UNITED STATES TAX COURT

ESTATE OF AARON U. JONES, DONOR, DECEASED, REBECCA L. JONES AND DALE A. RIDDLE, PERSONAL REPRESENTATIVES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27952-13.                    Filed August 19, 2019.

D. John Thornton and Kevin C. Belew, for petitioners.

Kelley A. Blaine, Amy B. Ulmer, Erik W. Nelson, and Janice B. Geier, for respondent.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  In a notice of deficiency dated September 5, 2013, respondent determined a deficiency in gift tax of $44,986,416.[1]  After concessions,[2] the issues for decision are the valuations, as of May 28, 2009 (the valuation date), of the following equity interests transferred as gifts:  (1) 10,267.67 limited partner units in Seneca Jones Timber Co. (SJTC), (2) 4,800 shares of class B nonvoting stock in Seneca Sawmill Co. (SSC), (3) 5,456 shares of class B nonvoting stock in SSC, and (4) 1,300 shares of class A voting stock in SSC.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulated facts are incorporated in our findings by this reference.  Mr. Jones resided in Oregon when the petition was timely filed.  After Mr. Jones' death on September 14, 2014, Mr. Riddle and Ms. Jones, who also resided in Oregon when the petition was filed, were appointed as personal representatives of the estate.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect at all relevant times.  Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[2] Respondent conceded that the estate is not liable for accuracy-related penalties under sec. 6662(h) and that the estate's net-net gift arrangement is permissible, subject to Rule 155 computations.

[*3] I.  History of the Seneca Companies

    A.  Founding of Seneca Sawmill Co.

Mr. Jones established SSC in Eugene, Oregon, in 1954 as an Oregon corporation.  SSC employed 25 people during its first year in operation and manufactured 18 million board feet of dimensional lumber.  SSC has significantly expanded its operations since its organization.  It built a lumber storage shed and expanded its log pond in 1959, purchased an adjacent mill facility and built a barker for its mills in 1961, and paved and expanded the lumber and log yards and added a chipper in 1965 before remodeling the dimension sawmill in 1967.  SSC expanded its log yard twice more, in 1971 and 1980, and built a new mill in 1978.  SSC built its stud mill in 1988 and further expanded its log yard and eliminated its log pond in 1990.

    B.  Acquisition of Timberlands and Founding of Seneca Jones Timber Co.

From its founding through the 1980s SSC was largely dependent on timber from Federal lands.  Mr. Jones began to consider acquiring timberlands in the early to mid-1980s when environmental regulations put continued access to Federal timberlands at risk.  In 1989 when Mr. Jones became convinced that SSC soon would be unable to rely on timber from Federal lands, he purchased

**[*4]** approximately 25,000 acres of timberland from the Woolley family. In 1992 Mr. Jones purchased an additional 104,000 acres of timberland from Champion International and 21,000 acres from Pope & Talbot.

On August 25, 1992, Mr. Jones formed SJTC, an Oregon limited partnership, to invest in, acquire, hold, and manage timberlands and real property and to incur indebtedness, and he contributed the timberlands he purchased in 1989 and 1992 in exchange for an interest. Mr. Jones contributed the timberlands to SJTC rather than SSC because of tax and liability concerns. SJTC's timberlands were intended to be SSC's inventory.

SSC and SJTC share headquarters in Eugene, which were built in 1996. SSC owns a 10% interest in SJTC as the sole general partner. As general partner SSC has broad powers to manage and control SJTC.

In 1997 SSC continued expanding with the construction of its log merchandiser complex. In 2000 SSC modified its stud mill to increase production length capabilities and, in 2006, built a stud mill facility capable of handling smaller logs--as small as four inches in diameter--called a hewsaw line.

**[*5]** II.  <u>Operations and Management of the Seneca Companies</u>

    A.  <u>SSC</u>

SSC considers itself to be among the best lumber manufacturers in the world.  SSC's two mills--its dimension and stud mills--are technologically advanced and enable it to deliver high-quality products quickly while demanding a higher price than its competitors.  Some of the technological advancements featured in SSC's mills were developed by Mr. Jones, and SSC owns more than 25 patents.  The annual production capacities of the dimension mill and the stud mill are 214 million board feet and over 160 million board feet, respectively.  In 2008 the dimension mill produced 140 million board feet, and the stud mill produced 103 million board feet.

SSC sells its lumber around the country although the bulk of its sales are made in the Western United States.  SSC's customers can pick up their lumber orders at the mills or have them shipped by truck or railroad flatcar, depending on the size of the order.  As of the valuation date SSC's dimension and stud lumber were used primarily to build houses and, therefore, its lumber sales were almost completely dependent on housing starts.

As of the valuation date SSC's largest supplier of logs was SJTC, although its production capacity required it to purchase additional logs elsewhere.  In 2008

[*6] SSC purchased 32% of the logs it milled directly from SJTC. Additionally, it acquired 24% of its logs indirectly from SJTC, through timber trades with Roseburg Forest Products (Roseburg). See infra pp. 9-10. SSC bought 30% of its logs from third-party sellers and 14% was stumpage or purchased under Government contract. Because SSC purchases Federal timber, it is prohibited from selling its lumber outside the United States.

SSC's management team as of the valuation date was as follows:

| Name | Position |
| --- | --- |
| Aaron Jones | President, chief executive officer, and chairman of the board |
| Richard T. Re | Senior vice president, general manager, and assistant secretary |
| Dale A. Riddle | Senior vice president of legal affairs |
| Gary Brokaw | Vice president, chief financial officer, secretary, and treasurer |
| Todd Payne | Vice president--timber management |
| Scott Keep | Vice president--land and timber |
| Ted Bennett | Superintendent--production |
| Wayne Madsen | Logging manager |
| Anita Rea | Controller |
| Jody Jones | Senior vice president--property development |

**[\*7]**   As of the valuation date SSC employed 263 employees, who were classified as executive, administrative, or manufacturing.  SSC's manufacturing employees included approximately 115 to 120 skilled mill workers, 35 to 40 semiskilled workers, and approximately 20 laborers.  In 1986 SSC elected to be taxed as an S corporation.  It was on the valuation date, and continues to be, an S corporation.

B.  SJTC

SJTC held approximately 1.45 billion board feet of timber over 165,000 acres in western Oregon as of the valuation date.  Most of SJTC's trees are located in Lane and Douglas Counties, but some are located in Benton, Coos, Curry, Josephine, and Linn Counties.  Almost all of its timberland was acquired in the three initial purchases in 1989 and 1992.  SJTC sought, and continues to seek, to add to its tree farms, but it has found it difficult to compete for acquisitions with timber investment management organizations (TIMOs) and real estate investment trusts (REITs).[3]

The predominant species on SJTC's timberlands was Douglas fir, although SJTC's timber also included Hemlock fir, Western Red Cedar, Red Alder, and

---

[3] A TIMO is an investment manager that specializes in large investments in timberland.  TIMOs do not own timberlands; rather they typically find and purchase timberland for clients as investments and then manage those investments for their clients.  TIMOs and REITs do not practice sustained yield harvesting.

[*8] others.  Timber is a long-term asset that increases in value as it grows, but only to a point.  The range of merchantability--during which the timber is of prime harvesting maturity--for timberlands similar to SJTC's typically begins at 40 years.  SJTC typically harvested its trees when they were 50 to 55 years old.

SJTC practiced sustained yield harvesting, which means it limited its harvest to the growth of its tree farms.  In doing so SJTC used a model that projects out 50 years, assuming a 50-year growth term, to determine its annual yield each year.  SJTC also used computer programs, including geographic information systems such as ArcGIS--which is targeted to tree farm needs--and a timber inventory management system to create, map, chart, visualize, and analyze data sets to optimize its operation.  The land management practices employed by SJTC often surpassed those mandated by the Sustainable Forestry Initiative Program--in which SJTC is a participant--and the Oregon Forest Practices Act, with respect to sustainable timber production, reforestation, wildlife protection, air and water protection, road construction, and recreational activities.

SJTC prepared its timberland soil and sites to maximize growth, participated in cooperatives that produce high-quality seeds, selected high-quality seedlings from several nurseries, planted the seedlings by hand, and protected the seedlings from predators.  SJTC protected its trees from bears and ensured that

[*9] they had enough space, nutrients, and water to grow to maturity. SJTC's road maintenance staff oversaw the construction and maintenance of access roads. In addition SJTC participated in State and local government water rehabilitation efforts and in wildfire prevention and suppression efforts.

SJTC's management team was identical to that of SSC and was paid by SSC. SJTC had 21 employees on the valuation date, composed of administrative and forestry staff. SJTC relied on SSC for human resources, legal services, and its controller, and it paid a $1.2 million annual fee for administrative services to SSC. It also used independent contractors for most of its activities on the tree farm, including planting seedlings, road construction, and harvesting trees. SJTC's forestry staff oversaw between 150 and 200 contractors to ensure that they completed their tasks according to SJTC's standards and objectives.

In 2008 SJTC harvested 67,795,000 board feet of timber. Approximately 51% of the timber it harvested--34,756,000 board feet--was sold to SSC. SJTC also traded logs from its tree farms that were closer to Roseburg's mills for Roseburg's logs that were closer to SSC's mills in order to reduce hauling costs. Including the Roseburg trades, approximately 89% of SJTC's harvested logs went to SSC. SJTC charged SSC the highest price that SSC paid for logs on the open market. The only logs that SJTC did not directly or indirectly sell to SSC were

[*10] logs that SSC's mills were not capable of processing.  In 2008 SJTC made trades with Roseburg equal to approximately 37% of the logs it harvested.

In addition, SJTC had an agreement with Roseburg to engage in tax-deferred timberland exchanges to improve the site class of the timberlands and to acquire land that was easier to access.  These exchanges involved extensive due diligence.

C.  Third-Party and Intercompany Loans

SJTC and SSC were joint parties to their third-party credit agreement.  Bank loans were reported on SJTC's books because its property--its timber--served as collateral.  Without SJTC's timber, SSC was not likely to be able to obtain financing on its own.  Management would apply borrowed cash where it was needed, transferring it without restriction and documenting it as a loan from SJTC.  And when SSC generated revenue by selling processed logs, it transferred money in the form of a loan or a receivable to SJTC to repay the bank loans that SJTC had taken out against its timber.  On the valuation date SSC held a $32.7 million receivable from SJTC.  The companies did not require collateral, and they charged interest at the rate specified in their bank loan agreement.

Mr. Brokaw completed financial projections at the end of each year to be included in the annual statements provided to lenders.  In preparing these

[*11] projections, he gathered necessary information, such as log prices and tree harvest and mill production numbers, from across the Seneca companies. The annual projections were premised on the most likely outcome.

### D. Formation of Seneca Sustainable Energy

During the mid-1990s SSC began to notice a shift in market preferences from green lumber, which still has the natural moisture in trees, to dry lumber, which has had the moisture removed. SSC produced green lumber almost exclusively until the early to mid-2000s, at which point it became clear that it would have to move from green to dry lumber. To produce dry lumber SSC had to build dry kilns and a boiler, which it planned to power with the sawdust and bark that remained after it cut the logs into lumber. SSC decided to take advantage of Federal Government incentives and a vibrant energy market. It built a renewable energy plant to create steam energy to heat its dry kiln and to sell onto the electrical grid. In 2009 Mr. Jones formed a separate entity, Seneca Sustainable Energy, LLC (SSE), to own and manage the renewable energy plant.

The renewable energy plant was estimated to cost approximately $50 million. While SSC's management planned for SSE to finance construction of the plant by getting a construction loan from a bank, SSC was forced to borrow against SJTC's timberlands because the state of the economy made banks hesitant

[*12] to make construction loans in 2009. SJTC advanced SSE $18,412,009 in 2009, growing to over $52 million by 2010.

E. Symbiotic Relationship Between SJTC and SSC

SJTC and SSC, while separate legal entities, operated in tandem in furtherance of SSC's sawmill business. SJTC's formation and its subsequent activities were for the benefit of SSC. Starting in 1989 Mr. Jones purchased what would become SJTC's timberlands after becoming convinced that SSC's continued access to Federal timberlands--its primary source of logs--was at risk. SJTC, since its formation, has aimed to expand its timberland holdings under the theory that making a steady stream of timber available to SSC allows SSC to avoid having to fight for a limited supply of timber on the open market and gives it a better chance to succeed and flourish. To this end, SJTC sells--either directly or through trades--all of the logs it can to SSC, selling only logs incompatible with SSC's equipment to third parties.

SSC's ability to use SJTC's timberlands to secure bank loans also has been integral to SSC's operations, particularly during the subprime mortgage crisis. Even as SJTC reduced its harvest, and SSC was forced to cut back on staff hours, SJTC's timberlands allowed SSC to obtain loans to maintain cashflow and to

[*13] finance the construction of the renewable energy plant at a time when construction loans were not typically available.

And aside from SSC's 10% general partner interest in SJTC, the ownership of SSC and SJTC as of the valuation date was virtually the same. Mr. Jones owned the bulk of the shares or units and each of his daughters--Rebecca Jones, Kathleen Jones, and Jody Jones--owned a small interest. SSC's management team managed SJTC and SJTC paid SSC a fee for administrative services, including human resources, legal services, and accounting. And as noted above, SJTC and SSC lent money back and forth, sending cash where it was most needed and charging each other the interest rate they negotiated with institutional lenders.

III. Effects of Economic Crisis on Operations

As of the valuation date the United States was experiencing severe economic turmoil amidst the subprime mortgage crisis, especially in the housing market. Housing starts, which measure new residential construction projects during a given period, declined in the United States from 2.3 million units in early 2006 to 490,000 units in early 2009. The crisis required SSC to reduce production. It also reduced the hours that its employees worked so that it could avoid layoffs. The crisis also prompted SJTC to reduce its timber harvest between 2007 and 2009, minimizing the number of logs it sold at depressed prices while its

[*14] unharvested timber continued to appreciate. Other companies in the area that did not own timberlands were not able to survive the recession because they were unable to generate sufficient cashflows or borrow money at affordable interest rates.

In the midst of the recession, in early 2009, Roseburg, a competitor with neighboring timberlands, approached SJTC about a timberland exchange because Roseburg was concerned about its compliance with loan covenants. SSC's management team completed revised financial projections for both SJTC and SSC in April 2009 to assess their abilities to comply with their own loan covenants, using the same process to complete the April 2009 projections that it used to complete its regular, yearly financial projections. The April 2009 projections showed more pessimistic results than the projections SJTC completed for 2009 and 2010 at yearend. SJTC agreed to the exchange to boost its revenue for generally accepted accounting principles purposes to ensure compliance with its own loan covenants and to improve its land access and site class.

IV. Ownership of Seneca Companies and Gifts

A. SSC

SSC had the authority to issue 10,000 shares of class A common stock and 90,000 shares of class B common stock. SSC shareholders were entitled to one

[*15] vote per share of class A stock on matters voted on by shareholders.

Holding class B stock did not entitle shareholders to vote. As of the valuation date

SSC had issued all 10,000 shares of class A stock and 41,100 shares of class B

stock. Immediately before the gifts of SSC stock, the ownership of SSC was as

follows:

| Owner | Class A shares | Class B shares |
|---|---|---|
| Aaron U. Jones | 4,900 | 39,468 |
| Dale A. Riddle[1] | 600 | -0- |
| Rebecca Jones | 1,500 | 544 |
| Kathleen Jones | 1,500 | 544 |
| Jody Jones | 1,500 | 544 |

[1] Mr. Riddle was a shareholder as trustee of the Aaron U. Jones Children's Trust.

SSC's shareholders could not sell, give away, or transfer their SSC stock

unless they did so in compliance with the Buy-Sell Agreement. Any sale of SSC

stock that caused SSC to cease to be an S corporation would be null and void

under the Buy-Sell Agreement, unless SSC and shareholders of a majority of its

outstanding shares gave their consent. If an SSC shareholder intended to sell, give

away, or transfer SSC stock to a person other than a family member, the

shareholder had to notify SSC, which had the right of first refusal with respect to

[*16] those shares. If SSC declined to purchase the shares, the other shareholders were given the option to purchase them. If SSC or the other shareholders did exercise their option to purchase shares, the purchase price was the fair market value of the shares. Fair market value, for purposes of the Buy-Sell Agreement, was to be mutually agreed upon or, if the parties could not come to an agreement, determined by an appraisal. Under the Buy-Sell Agreement, the reasonably anticipated cash distributions allocable to the shares had to be considered and discounts for lack of marketability, lack of control, and lack of voting rights had to be applied in determining the fair market value.

B. SJTC

SSC, as SJTC's general partner, made all management decisions for SJTC and had full control over its business. SSC's broad powers as the general partner of SJTC included the powers to buy, sell, and exchange timberlands and partnership property; to plant trees, harvest timber, and sell logs; and to incur indebtedness. Limited partners did not participate in the SJTC's management, although they had the right to vote on the continuation of SJTC, the appointment of a successor as general partner, the admission of an additional general partner, the dissolution of SJTC, and amendments to the partnership agreement. The unanimous consent of all partners was required to admit an additional general

[*17] partner or to dissolve SJTC. Immediately before the gifts of SJTC partnership units, the ownership of SJTC was as follows:

| Owner | General partner units | Limited partner units |
| --- | --- | --- |
| Aaron U. Jones | -0- | 43,290.717 |
| SSC | 5,550.092 | -0- |
| Rebecca Jones | -0- | 2,220.037 |
| Kathleen Jones | -0- | 2,220.037 |
| Jody Jones | -0- | 2,220.037 |

Under SJTC's partnership agreement, limited partners were restricted in their ability to transfer their interests in SJTC. No transfer of SJTC partnership units was valid if it would terminate the partnership for Federal or State tax purposes. The consent of all partners was required for the substitution of a transferee of SJTC partnership units as a limited partner. A transferee who was not substituted as a limited partner would be merely an assignee of allocations of partnership profits and loss. Limited partners were also subject to a Buy-Sell Agreement, which restricted transfers of their interests in SJTC. It mirrored SSC's Buy-Sell Agreement: Any transfers that would terminate SJTC's partnership status for tax purposes were void; SJTC and then the other limited partners were granted a right of first refusal before a limited partner transferred his or her units; and a determination of fair market value had to take into account lack of

[*18] marketability, lack of control, lack of voting rights of an assignee, and the reasonably anticipated cash distributions allocable to the units.

C. Gifts and Succession Plan

In 1996 Mr. Jones began to create a succession plan to ensure that his family businesses remained operational in perpetuity. As part of this plan, he formed the following family and generation-skipping trusts on May 28, 2009, to which interests in the companies would be transferred as gifts:

| Trust | Trustee | Beneficiary |
|-------|---------|-------------|
| Aaron U. Jones Voting Stock Trust | Dale Riddle | Issue of Aaron Jones |
| Kathleen Jones Hall Family Trust | Kathleen Jones Hall | Kathleen Jones Hall and her issue during her lifetime and, after her death, her children |
| Jody Jones Family Trust | Jody Jones | Jody Jones and her issue during her lifetime and, after her death, her children |
| Rebecca Jones Family Trust | Rebecca Jones | Rebecca Jones and her issue during her lifetime and, after her death, her children |
| Kathleen Jones Hall Trust | Kathleen Jones Hall | Kathleen Jones Hall |
| Jody Jones Trust | Jody Jones | Jody Jones |
| Rebecca Jones Trust | Rebecca Jones | Rebecca Jones |

[*19] On the valuation date, Mr. Jones gave blocks of stock in SSC in the following amounts:

| Trust | Class A shares | Class B shares |
|---|---|---|
| Aaron U. Jones Voting Stock Trust | 1,300 | -0- |
| Kathleen Jones Hall Family Trust | -0- | 4,800 |
| Jody Jones Family Trust | -0- | 4,800 |
| Rebecca Jones Family Trust | -0- | 4,800 |
| Kathleen Jones Hall Trust | -0- | 5,456 |
| Jody Jones Trust | -0- | 5,456 |
| Rebecca Jones Trust | -0- | 5,456 |

In addition, Mr. Jones made gifts to each of his daughters--Rebecca Jones, Kathleen Jones Hall, and Jody Jones--of blocks of 10,267.67 SJTC limited partner units and 10,256 shares of class B nonvoting stock in Rifle Range Road Corp. (Rifle Range).

Immediately after the gifts were made, the ownership of SSC was as follows:

| [*20]                              Owner | Class A shares | Class B shares |
|---|---|---|
| Aaron U. Jones | 3,600 | 8,700 |
| Aaron U. Jones Voting Stock Trust | 1,300 | -0- |
| Dale Riddle[1] | 600 | -0- |
| Rebecca Jones | 1,500 | 544 |
| Kathleen Jones Hall | 1,500 | 544 |
| Jody Jones | 1,500 | 544 |
| Rebecca Jones Family Trust | -0- | 4,800 |
| Kathleen Jones Hall Family Trust | -0- | 4,800 |
| Jody Jones Family Trust | -0- | 4,800 |
| Rebecca Jones Trust | -0- | 5,456 |
| Kathleen Jones Hall Trust | -0- | 5,456 |
| Jody Jones Trust | -0- | 5,456 |

[1] Mr. Riddle was a shareholder as trustee of the Aaron U. Jones Children's Trust.

Immediately after the gifts were made, the ownership of SJTC was as follows:

| Owner | General partner units | Limited partner units |
|---|---|---|
| Aaron U. Jones | -0- | 12,487.707 |
| SSC | 5,550.92 | -0- |
| Rebecca Jones | -0- | 12,487.707 |
| Kathleen Jones Hall | -0- | 12,487.707 |
| Jody Jones | -0- | 12,487.707 |

[*21] Mr. Jones signed net-net gift agreements with each of his daughters in which his daughters assumed liability for the gift tax and estate tax associated with the transfers made on the valuation date.

Mr. Jones timely filed his Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for the 2009 tax year, along with valuation reports for SSC and SJTC prepared by Columbia Financial Advisors, Inc. (Columbia Financial).  Columbia Financial came to the following valuation conclusions:

| Shares/units | Value per share/unit | Value of block |
| --- | --- | --- |
| SSC class A (voting) | $325 | $422,500 |
| SSC class B (nonvoting) 1 | 315 | 1,512,000 |
| SSC class B (nonvoting) 2 | 315 | 1,718,640 |
| SJTC limited partnership units | 350 | 3,593,685 |

In the notice of deficiency, respondent made the following determinations of value:

| [*22]     Shares/units | Value per share/unit | Value of block |
|---|---|---|
| SSC class A (voting) | $1,395 | $1,813,032 |
| SSC class B (nonvoting) 1 | 1,325 | 6,359,568 |
| SSC class B (nonvoting) 2 | 1,325 | 7,228,709 |
| SJTC limited partnership units | 2,511 | 25,780,000 |
| Rifle Range class B[1] | 4.20 | 43,075 |

[1] The estate has not introduced any evidence or made any argument regarding respondent's adjustments to the block of Rifle Range stock transferred as gifts.  We therefore deem those conceded.

V.  Expert Valuation Reports

Both parties submitted expert reports providing valuations of the blocks of SJTC limited partnership units transferred by Mr. Jones.  The estate submitted an expert report providing a valuation of the blocks of class A and class B SSC stock transferred by Mr. Jones, and respondent submitted a rebuttal expert report critiquing that valuation.  We provide a summary of their conclusions and our own conclusions as to their valuations below as part of our analysis.

**[\*23]**                                              OPINION

## I.  Introduction and Burden of Proof

At issue are the values of Mr. Jones' gifts of SSC class A and B stock and SJTC limited partnership units.  Ordinarily, the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The estate asserts that it provided complete and conclusive documentation and credible testimony of a correct valuation of the interests in SJTC and SSC sufficient to shift the burden of proof under section 7491(a).

Under section 7491(a)(1), "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue."  See Higbee v. Commissioner, 116 T.C. 438, 442 (2001) ("Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995)).  The resolution of this issue does not depend on which party has the burden of proof.

[*24] We resolve it on the basis of a preponderance of the evidence in the record. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008), supplementing T.C. Memo. 2007-340; Schank v. Commissioner, T.C. Memo. 2015-235, at *16.

The SSC Class A and B stock and the SJTC units were valued at $325, $207, and $230, respectively, on the gift tax return.[4] The estate now asserts that the interests' fair market values are $390, $380, and $380, respectively, thus conceding a small part of respondent's deficiency. Respondent subsequently increased his valuation of an SJTC limited partnership unit from $2,511 to $2,530, and he bears the burden of proof with respect to the increased deficiency attributable to that increase in valuation. See Anselmo v. Commissioner, 80 T.C. 872, 886 (1983), aff'd, 757 F.2d 1208 (11th Cir. 1985); Learner v. Commissioner, T.C. Memo. 1983-122.

## II. Gift Tax Valuation Principles

Gift tax is imposed for each calendar year on the transfer of property by gift during that taxable year by an individual. Sec. 2501(a). Gift tax ordinarily is to be paid by the donor. Sec. 2502(c). The tax is computed on the basis of the taxable gifts made in a calendar year. Sec. 2502(a). The term taxable gifts means the total

---

[4] The estate's reported values differ from the values at which Columbia Financial arrived.

**[*25]** amount of gifts made in the year, less certain deductions. Sec. 2503(a). The total amount of gifts in the year is the sum of the values of the gifts made in the year in excess of the exclusion amount in section 2503(b). Sec. 25.2503-1, Gift Tax Regs. The value of a gift of property is determined as of the date it is given. Sec. 2512(a).

The fair market value of property transferred as a gift is the price at which it would change hands between a willing buyer and a willing seller, neither under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); sec. 25.2512-1, Gift Tax Regs. The willing buyer and seller are hypothetical persons, not any specific or named person. Estate of Simplot v. Commissioner, 249 F.3d 1191, 1195 (9th Cir. 2001), rev'g and remanding 112 T.C. 130 (1999); Morrissey v. Commissioner, 243 F.3d 1145, 1148 (9th Cir. 2001), rev'g T.C. Memo. 1999-119; Estate of Kahn v. Commissioner, 125 T.C. 227, 231 (2005).

When determining the fair market value of unlisted stocks for which no recent sales or bids have been made, several factors should be considered, including: the company's net worth, its earning power and dividend-paying capacity, its good will, the economic outlook in the industry, its management and

**[*26]** its position in the industry, the degree of control of the business represented in the block of stock to be valued, and the value of stock in similar, publicly traded companies. Sec. 25.2512-2(f)(2), Gift Tax Regs.; see also Estate of Adell v. Commissioner, T.C. Memo. 2014-155, at *42; Rev. Rul. 59-60, sec. 4, 1959-1 C.B. 237, 238-242. When determining the fair market value of an interest in a partnership, the value of the partnership's assets may be considered, along with the same factors considered in determining the fair market value of stock. Sec. 25.2512-3(a), Gift Tax Regs.

III. Expert Reports

A. The Estate's Expert

The estate's valuation expert, Richard Reilly, has performed approximately 100 business valuations of sawmills and timber product companies. Mr. Reilly valued SJTC and SSC as going concerns and relied on an income approach--specifically the discounted cashflow (DCF) method--and a market approach in valuing the units of SJTC and SSC transferred as gifts.

Mr. Reilly concluded that SJTC was worth $21 million on a noncontrolling, nonmarketable basis, after adjustments and discounts, and he calculated a value of $380 per unit on the basis of the number of outstanding partnership units. Using

[*27] that valuation, the noncontrolling, nonmarketable value of the block of limited partner units transferred by Mr. Jones to each of his daughters is $3,901,715.

Mr. Reilly concluded that SSC was worth $20 million on a noncontrolling, nonmarketable basis, after adjustments and discounts, and he calculated a value of $390 per share of class A voting stock on the basis of the number of outstanding shares. He applied a 3% discount for lack of voting rights by relying on empirical studies and arrived at a $380 value per share of class B nonvoting stock.

## B. Respondent's Experts

Respondent's valuation expert, Philip Schwab, has performed several privately held business valuations. Mr. Schwab valued SJTC as a going concern and relied on an asset-based approach--specifically the net asset value (NAV) method--and a market approach in valuing one SJTC limited partnership unit. After applying adjustments and discounts, Mr. Schwab determined that the value of SJTC on a noncontrolling, nonmarketable basis was $140,398,000. He determined a value of $2,530 per limited partner unit on the basis of the number of outstanding partnership units and a value of $25,973,611 for the block of units Mr. Jones transferred to each of his daughters.

[*28] John Ashbrook was respondent's rebuttal expert with respect to Mr. Reilly's valuation of SSC stock. Mr. Ashbrook previously had reviewed and completed several business valuations, including several sawmills. Mr. Ashbrook challenged Mr. Reilly's use of the April 2009 revised projections and his treatment of SSC's general partner interest in SJTC and the intercompany receivable it held.

C. Valuation Issues

When considering expert testimony, we have "broad discretion to evaluate 'the overall cogency of each expert's analysis.'" Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), aff'g in part, rev'g in part T.C. Memo. 1983-200), aff'g in part, rev'g in part T.C. Memo. 1986-318. We are not bound to follow the opinion of any expert witness where it is contrary to our own judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); Estate of Adell v. Commissioner, at *43. And we may adopt or reject an expert's opinion in whole or in part. Davis v. Commissioner, 110 T.C. 530, 538 (1998); see also Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). Valuation is a question of fact, and the factors considered in determining value should be weighed according to the circumstances in each case.

**[\*29]** <u>Sammons v. Commissioner</u>, 838 F.2d at 334; Rev. Rul. 59-60, sec. 5, 1959-1 C.B. at 242.

Three generally accepted approaches are used to value equity interests in closely held businesses:  the income approach, the market approach, and the asset-based approach.  <u>Exelon Corp. v. Commissioner</u>, 147 T.C. 230, 244 (2016), <u>aff'd</u>, 906 F.3d 513 (7th Cir. 2018); <u>Estate of Noble v. Commissioner</u>, T.C. Memo. 2005-2, 2005 WL 23303, at \*7.  The income approach uses either the direct capitalization method or the DCF method to convert the anticipated economic benefits that the holder of the interest would stand to realize into a single present-valued amount.  <u>Estate of Noble v. Commissioner</u>, 2005 WL 23303, at \*7.  The market approach values the interest by comparing it to a comparable interest that was sold at arm's length in the same timeframe, accounting for differences between the companies by making adjustments to the sale price.  <u>Id.</u>  And the asset-based approach values the interest by reference to the company's assets net of its liabilities.  <u>Id.</u>  When valuing an operating company that sells products or services to the public, the company's income receives the most weight.  <u>See</u> <u>Estate of Andrews v. Commissioner</u>, 79 T.C. 938, 944-945 (1982).  When valuing a holding or investment company, which receives most of its income from holding

[*30] debt, securities, or other property, the value of the company's assets will receive the most weight. Id. at 945.

The primary dispute between the parties is whether SJTC should be valued using an income approach or an asset-based approach. The parties have several other points of dispute: (1) the reliability of the 2009 revised projections, (2) the propriety of "tax-affecting", (3) the proper treatment of intercompany loans from SSC to SJTC, (4) the proper treatment of SSC's 10% general partner interest in SJTC, and (5) the appropriate discount for lack of marketability. We consider these in detail below.

IV. Valuing SJTC

The estate contends that SJTC is an operating company that sells a product--logs--and, therefore, should be valued as a going concern with primary consideration to its earnings. See Rev. Rul. 59-60, sec. 5(a). Respondent, on the other hand, contends that SJTC is a natural resource holding company and, therefore, the value of its timberlands--its underlying assets--should be given primary consideration in our valuation. See id. The estate rejects respondent's asset-based valuation because there is no likelihood of SJTC's selling its timberlands.

**[*31]** A. <u>Operating Versus Holding Company</u>

The parties do not dispute that SJTC is a going concern. Rather, they disagree on whether SJTC is an operating company that sells a product or a natural resource holding company that simply holds timber as an investment for its partners. Not all companies are apt to be characterized as simply an operating company or a holding or investment company. <u>Estate of Andrews v. Commissioner</u>, 79 T.C. at 944. An example is a company whose assets, especially its real property, play a significant role in its income-producing operations. <u>See Estate of Smith v. Commissioner</u>, T.C. Memo. 1999-368, 1999 WL 1001184, at *5. When valuing an interest in a company that has aspects of both an operating company and a holding or investment company, we will not "restrict [our] consideration to only one approach to valuation". <u>Estate of Andrews v. Commissioner</u>, 79 T.C. at 945.

SJTC's timberlands are its primary asset, and they will retain and increase in value, even if SJTC is not profitable on a year-to-year basis. <u>See id.</u> at 944. Therefore, it may be appropriate to consider an asset-based approach in valuing an interest in SJTC. <u>See Estate of Smith v. Commissioner</u>, 1999 WL 1001184, at *5.

SJTC also is an operating company that plants trees and harvests and sells the logs. <u>Cf. Harwood v. Commissioner</u>, 82 T.C. 239, 243, 265 (1984) (holding

**[\*32]** that a timber company that simply acquired and held timberlands and timber rights for use by its affiliated companies should be valued on the basis of its assets), aff'd, 786 F.2d 1174 (9th Cir. 1986). It expends significant time and effort to ensure that its operation is efficient, including selecting high-quality seedlings, planting them properly, and protecting them once planted. It also practices sustained yield harvesting, which requires the use of sophisticated software to ensure that it could maintain its timberlands over the long term, even if selling the land or harvesting all of the trees would be most profitable in the short term. Thus, SJTC is different from TIMOs, REITs, and other holding or investment companies, and an income approach may be appropriate in valuing an interest in SJTC.

We conclude that SJTC has aspects of both an operating company and an investment or holding company. Because it does not fit neatly into either category, a valuation that combines consideration of SJTC's earnings and assets and weights each appropriately may be necessary, so we must dig deeper into the facts.

**[\*33]** B. <u>Sale of Timberlands</u>

An asset-based approach necessarily assumes access to the value of SJTC's underlying assets--its timberlands--through a hypothetical sale. The likelihood that SJTC would sell its timberlands goes to the relative weight that we give an asset-based approach in valuing SJTC; the less likely SJTC is to sell its timberlands, the less weight we should assign to an asset-based approach. <u>See</u> <u>Estate of Giustina v. Commissioner</u>, 586 F. App'x 417, 418 (9th Cir. 2014) (holding that no weight should be given to an asset-based valuation because the assumption of an asset sale was a hypothetical scenario contrary to the evidence in the record), <u>rev'g and remanding</u> T.C. Memo. 2011-141, 2011 WL 2559847.

The parties disagree on two points that bear on whether SJTC would sell its timberlands: (1) whether SJTC could sell its timberlands and (2) whether we should consider SJTC separately or as a single business enterprise with SSC. Respondent contends that circumstances may arise in which SJTC could and would sell its timberlands. The estate argues that holders of blocks of SJTC limited partnership units could not force a sale of its timberlands under the partnership agreement and that SSC, which has the exclusive authority to direct SJTC to make such a sale, would never exercise that authority. Respondent argues that this inappropriately considers specific--rather than hypothetical--buyers and

[*34] sellers. We disagree. SSC's exclusive authority to exercise control over SJTC under the partnership agreement, its interest in SJTC's continued ownership of the timberlands, see infra, and the restrictions imposed on limited partners under the partnership agreement do not depend on how many limited partners SJTC has or who they are. These restrictions apply to the interest because of the partnership agreement and the rights held by SSC and would be taken into account by any hypothetical buyer and seller of a limited partner interest.

As further support for its position, the estate argues that we should consider SJTC and SSC as a single business operation even though they are separate legal entities. Respondent argues that because SJTC and SSC are separate legal entities, we should ignore their interdependent relationship when valuing them. SSC's continued operation as a sawmill company depended on SJTC's continued ownership of timberlands and there was no likelihood that SSC, as SJTC's general partner, would direct SJTC to sell its timberlands while SSC continued operations as a sawmill. In addition, they had almost identical ownership, and they shared administrative staff. Therefore, on the basis of the facts we found above, we conclude that SJTC and SSC were so closely aligned and interdependent that, in valuing SJTC, it is appropriate to take into account its relationship with SSC and vice versa. Contrary to respondent's objection, this does not ignore the status of

**[*35]** SJTC and SSC as separate legal entities but recognizes their economic relationship and its effect on their valuations.

We, therefore, conclude that an income-based approach, like Mr. Reilly's DCF method, is more appropriate for SJTC than Mr. Schwab's NAV method valuation. See Estate of Giustina v. Commissioner, 586 F. App'x at 418.

C. Mr. Reilly's DCF Method

Respondent offered two principal criticisms of Mr. Reilly's DCF method valuation: (1) Mr. Reilly should not have relied on the April 2009 revised projections and (2) Mr. Reilly should not have "tax-affected" SJTC's earnings before interest and taxes (EBIT) in projecting net cashflow.

1. April 2009 Revised Projections

Respondent argues that the April 2009 revised projections that Mr. Reilly used in determining SJTC's net cashflow were unreliable. These revised projections were made less than two months after SJTC's annual report out of concern that SJTC was going to violate loan covenants.

The companies' management team completed the April 2009 revised projections using the same process that they used to prepare the yearly projections included in their annual reports. They were the most current projections and were relied on for business decisions at the valuation date. In fact, respondent's expert,

[*36] Mr. Schwab, also used the revised projections in his guideline publicly traded companies valuation. He averaged the revised projections with the projections from the most recent annual report because he thought the revised projections may have represented the worst-case scenario and were overly pessimistic, not because he felt the projections were unreliable. The only ground for challenging the reliability of the revised projections is that the volatile economic conditions meant that they were not reliable for long. This is precisely why management wanted the revised projections. As they were the most current as of the valuation date, Mr. Reilly's use was appropriate.

### 2. "Tax-Affecting" the Valuation of SJTC

In his DCF method Mr. Reilly "tax-affected" SJTC's earnings. To do this he used 38% as a proxy for the combined Federal and State tax burdens that owners of SJTC would bear (treating SJTC in effect as a taxable C corporation, albeit at an individual, not corporate, tax rate), and adjusted both the earnings he used to calculate SJTC's net cashflow and the cost of debt capital he used to determine the appropriate discount rate. He then computed the benefit of the dividend tax avoided by estimating the implied benefit for SJTC's partners in prior years and considering an empirical study analyzing S corporation acquisitions cited in his report. In his guideline publicly traded companies valuation, he used

[*37] the tax-affected earnings as well, although the metrics he used to compare the companies to SJTC were pretax. Finally, he applied a 22% premium to SJTC's weighted business enterprise value (that is, his weighted DCF method and guideline publicly traded companies method valuations) to reflect that benefit.

Respondent contends that Mr. Reilly improperly adjusted SJTC's value for entity-level taxes even though it is a partnership and, therefore, is not liable for tax at the entity level, and there is no evidence that SJTC would become a taxable C corporation. He further argues that tax-affecting abandons the arm's length formulation of fair market value, in the absence of a showing that two unrelated parties dealing at arms length would tax-affect SJTC's earnings, because it inappropriately favors a hypothetical buyer over the hypothetical seller. Therefore, it understates the value of a limited partner interest in SJTC. Respondent instead argues that a zero tax rate appropriately reflects SJTC's flowthrough status.

The estate argues that a zero tax rate at the entity level would overstate the value of an interest in SJTC. This, it contends, is because SJTC is a passthrough entity, and its partners are taxed at their ordinary rates on their shares of partnership income and gain whether or not SJTC distributes any cash, and a hypothetical buyer would take this into consideration. And therefore, it contends,

**[\*38]** a valuation of SJTC must take into account the partners' tax liabilities in their expected return on their investment. The estate also argues that a hypothetical buyer and seller also would take into account the benefit of dividend taxes avoided by operating as a flowthrough.

In support of its argument, the estate cites <u>Bernier v. Bernier</u>, 873 N.E.2d 216 (Mass. 2007). There, in the context of a divorce dispute involving an S corporation, a Massachusetts State court held:

> [A]pplying the C corporation rate of taxation to an S corporation severely undervalues the fair market value of the S corporation by ignoring the tax benefits of the S corporation structure and failing to compensate the seller for the loss of those benefits. On the other hand, * * * we agree * * * that failure entirely to tax affect an S corporation artificially will inflate the value of the S corporation by overstating the rate of return that the retaining shareholder could hope to achieve. * * *

<u>Id.</u> at 221 (citing <u>Del. Open MRI Radiology Assocs. v. Kessler</u>, 898 A.2d 290, 327-328 (Del. Ch. 2006) ("Affording a remedy to the Kessler Group that denies the reality that each shareholder owes taxes on his proportional interest in Delaware Radiology would result in the Kessler Group receiving a higher per share value from the court than it could ever have realized as a continuing shareholder.")); <u>see also</u> Franklin M. Fisher, Christopher F. Noe, & Evan Sue Schouten, "The Sale of the Washington Redskins: Discounted Cash Flow

**[*39]** Valuation of S-Corporations, Treatment of Personal Taxes, and Implications for Litigation", 10 Stan. J.L. Bus. & Fin. 18 (2005); Courtney Sparks White, Comment, "S Corporations: A Taxing Analysis of Proper Valuation", 37 Cap. U. L. Rev. 1117 (2009).

In effect, both parties argue that a hypothetical buyer and seller would take into account SJTC's business form when determining the fair market value of a limited partner interest; they just disagree about how to do this. As we did in Gross v. Commissioner, T.C. Memo. 1999-254, 1999 WL 549463, aff'd, 272 F.3d 333 (6th Cir. 2001), and subsequent cases, we decide this question of fact on the basis of the record before us.

While respondent objects vociferously in his brief to petitioner's tax-affecting, his experts are notably silent. The only mention comes in Mr. Schwab's rebuttal report, in which he argues that Mr. Reilly's tax-affecting was improper, not because SJTC pays no entity level tax, but because SJTC is a natural resources holding company and therefore its "rate of return is closer to the property rates of return". They do not offer any defense of respondent's proposed zero tax rate. Thus, we do not have a fight between valuation experts but a fight between lawyers.

[*40] We do not find respondent's arguments against Mr. Reilly's methodology convincing. While respondent correctly points out that we rejected the proffered tax-affecting in Gross and later cases, he misconstrues our rationale. In Gross v. Commissioner, 1999 WL 549463, at *10, we concluded that "the principal benefit that shareholders expect from an S corporation election is a reduction in the total tax burden imposed on the enterprise. The owners expect to save money, and we see no reason why that savings ought to be ignored as a matter of course in valuing the S corporation." We then concluded that, on the record in that case, a zero-percent corporate tax rate properly reflected those tax savings, rejecting the expert's offered justifications.[5] More recently, in Estate of Gallagher v. Commissioner, T.C. Memo. 2011-148, 2011 WL 2559847, at *12, supplemented by T.C. Memo. 2011-244, we again rejected tax-affecting because the taxpayer's expert did not justify it but again acknowledged that the benefit of a reduction in the total tax burden borne by S corporation owners should be considered when

_____

[5] Indeed in discussing the analysis by the Commissioner's expert in Gross we noted the importance of treating both cashflows and the discount rate consistently, as Mr. Reilly did here. Gross v. Commissioner, T.C. Memo. 1999-254, 1999 WL 549463, at *10-*11, aff'd, 272 F.3d 333 (6th Cir. 2001). In Gross the expert applied a hypothetical 40% corporate tax rate to earnings but did not apply any premium to reflect the benefit of avoided dividend tax. Thus the Court was presented with a choice between a 40% or a 0% corporate tax rate. Id. That is not the choice before us here.

[*41] valuing an S corporation. And in Estate of Giustina v. Commissioner, 2011 WL 2516168, at *6, we rejected tax-affecting in the valuation of a partnership because we found the taxpayer's expert's method to be faulty: He used a pretax discount rate to present value posttax cashflow. The question in those cases, as here, was not whether to take into account the tax benefits inuring to a flowthrough entity but how.

We find on the record before us that Mr. Reilly has more accurately taken into account the tax consequences of SJTC's flowthrough status for purposes of estimating what a willing buyer and willing seller might conclude regarding its value. His adjustments include a reduction in the total tax burden by imputing the burden of the current tax that an owner might owe on the entity's earnings and the benefit of a future dividend tax avoided that an owner might enjoy. We are mindful that the science of valuing closely held companies usually results in a "gross terminal logical inexactitude" in the words of Winston Churchill. E.g., Maris v. Commissioner, T.C. Memo. 1980-444. And as we admonished in Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. at 452, "in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road

[*42] compromise which we suspect each of the parties expects the Court to reach." Mr. Reilly's tax-affecting may not be exact, but it is more complete and more convincing than respondent's zero tax rate.

### D.  The Market Approach

Both Mr. Reilly and Mr. Schwab also used the guideline public company method for SJTC, which values an interest in a subject company by comparing it to publicly traded companies in the same line of business, combining the resulting value from that method with their other chosen method.  Both experts conducted database searches for guideline companies that produced similar groups of companies.  In his brief respondent accepted Mr. Reilly's market approach valuation.  We do as well and recap it below.

Mr. Reilly chose six guideline companies:  Pope Resources, Plum Creek Timber, Potlatch Corp., Rayonier, Weyerhaeuser, and Deltic Timber.  He then used four different measures to assess the differences between SJTC and the guideline companies:  (1) EBIT, (2) earnings before interest, taxes, depreciation, depletion, and amortization (EBITDDA), (3) revenue, and (4) adjusted tangible book value of invested capital (ATBVIC).  ATBVIC is calculated by adding the accounting book value of the interest-holder's equity to the accounting book value

[*43] of the interest-bearing debt, minus the accounting book values of intangible assets and the timberlands, plus the estimated market value of the timberlands.

Mr. Reilly relied on SJTC's reported and projected earnings for the 2010 fiscal year, the last 12 months before the valuation date, and the historical five-year average, and SJTC's reported and projected revenue for the 2009 and 2010 fiscal years, the last 12 months before the valuation date and the historical five-year average. And he relied on SJTC's ATBVIC for the last 12 months before the valuation date. The estate accepted the timberland valuation submitted by respondent's expert, Christopher Singleton, which concluded that the timberland had a fair market value of $424 million as of the valuation date. Therefore, Mr. Reilly used $424 million as the estimated market value of SJTC's timberlands in calculating ATBVIC.

Mr. Reilly found that SJTC was significantly smaller than the median guideline company measured by revenue and assets in the last 12 months before the valuation date. He also found that SJTC was less profitable than all but one of the guideline companies measured by projected EBITDDA for the 2009 fiscal year, although it was more profitable than any of the guideline companies in terms of the historical five-year average of EBITDDA. Finally, while SJTC projected significant earnings growth between the 2009 and 2013 fiscal years, its revenue

[*44] decreased at a faster pace than the median guideline company over the previous five years.

To account for the differences between SJTC and the guideline companies, Mr. Reilly selected pricing multiples to apply to SJTC's financial fundamentals for EBIT and EBITDDA that were slightly above the guideline company low, for revenue that was slightly under the guideline company low, and for ATBVIC that was below the guideline company low. On the basis of the indicated enterprise values for each measure, Mr. Reilly calculated a weighted enterprise value for SJTC of $107 million on a noncontrolling, marketable basis.[6]

E. Intercompany Debt

Respondent argues that Mr. Reilly erred in his treatment of intercompany loans from SSC to SJTC. Mr. Reilly regarded the intercompany debt as a clearing account or "simply two pockets of the same pair of pants", excluding the receivable held by SSC and SJTC's offsetting liability, while taking account of SSC's and SJTC's intercompany interest income and expense. Respondent argues

---

[6] Mr. Reilly gave a 10% weight to each of EBIT and EBITDDA projections for the 2010 fiscal year, for the 12 months before the valuation date, and for the historical five-year average. He gave a weight of 5% to each of the revenue projections for the 2009 and 2010 fiscal years, the revenue for the 12 months before the valuation date, and the historical five-year revenue average. And he gave a 20% weight to the ATBVIC for the 12 months before the valuation date.

[*45] that Mr. Reilly eliminated the intercompany debt because it would have left SJTC with a negative value, an absurd conclusion that Mr. Reilly wished to avoid. Respondent argues that, while Mr. Reilly treated SSC's receivable from SJTC as an operating asset, it is actually a nonoperating asset, the value of which should have been added back into Mr. Reilly's DCF method valuation at the end. Respondent contends that the intercompany receivable is an investment in a separate company rather than one made in the course of SSC's business.

SJTC would have a negative value only if we accepted respondent's premise that we should not consider SJTC and SSC as a single business enterprise. We rejected respondent's premise. Here, the size of the intercompany debt is directly related to the connection between the two companies. SSC's loan to SJTC was not an investment in a separate company but rather an intercompany clearing account. Management used these accounts to move cash across the Seneca companies, as needed, assigning the cost of borrowing to the unit using the cash by charging interest on intercompany transfers. While the interest rate was arm's length in that it reflected the rate the Seneca companies were charged by the third-party lender, there was no indication that third-party loans would be available to SSC on those terms without the security of SJTC's timberlands. Rather the fact that SSC and SJTC's joint credit agreements are secured by SJTC's timberlands is evidence that

[*46] SSC could not obtain third-party loans. Similarly, the record does not support a conclusion that SJTC would be able to borrow from third parties the amounts of the outstanding loans from SSC on those terms, in addition to the third-party debt it had outstanding. By eliminating SSC's receivable and SJTC's payable and treating their intercompany interest income and expense as operating income and expense, Mr. Reilly captured their relationship as interdependent parts of a single business enterprise. Because SJTC's intercompany interest income and expense were accounted for in the DCF method valuation, the intercompany debt need not be added in at the end as a nonoperating asset. See Estate of Heck v. Commissioner, T.C. Memo. 2002-34.

V. Valuing SSC

Respondent did not submit a valuation of SSC and largely accepted the valuation methods and inputs Mr. Reilly used in his valuation of SSC. Respondent has three criticisms of Mr. Reilly's concluded values of $390 and $380 per share for SSC voting and nonvoting stock, respectively: (1) Mr. Reilly improperly treated SSC's $32.7 million receivable from SJTC as an operating asset, (2) Mr. Reilly improperly treated SSC's general partner interest in SJTC as an operating asset and improperly accounted for it in SSC's value, and (3) Mr. Reilly improperly tax-affected his DCF method valuation of SSC.

**[*47]** A. <u>Intercompany Debt</u>

Respondent objects to treatment of SSC's intercompany receivable from SJTC as an operating asset. As discussed above, SSC and SJTC were part of a single business enterprise, and management used intercompany accounts to move cash between the companies. SSC's advances to SJTC were not investments; they were cash transfers to the borrowing arm of the Seneca enterprise--SJTC--so that it could pay down debt to third-party lenders. Mr. Reilly's valuation properly eliminated these intercompany clearing accounts and properly treated the receivable as part of SSC's operations that produced operating income.

B. <u>SSC's General Partner Interest in SJTC</u>

Mr. Reilly accounted for SSC's general partner interest in SJTC in his DCF method by including a projected amount of partnership income in his projections. For each year in the projection period Mr. Reilly added $350,000 in partnership income, which he determined using the 5-year and the 10-year historical median distributions from SJTC.

Respondent contends that a valuation of SSC should account for the general partner's control over SJTC. He argues that Mr. Reilly understates the value of SSC's general partner interest in SJTC by limiting it to expected distributions. He contends that the general partner interest is a nonoperating asset--an outside

**[*48]** investment--that grants SSC exclusive control over the management of SJTC. Respondent argues, therefore, that the value of SSC's 10% general partner interest in SJTC is better represented by 10% of the value of SJTC than by projected annual distributions. But he has not offered an explanation as to how we should take SSC's control into account that also takes into account our finding that SSC would not direct SJTC to sell its timberlands. We conclude instead that the general partner interest is an operating asset. That controlling interest ensured that SSC and SJTC could be operated as a single business enterprise. And respondent agrees with the estate that SSC is an operating company and should be valued on the basis of its earnings. In this light we find Mr. Reilly's use of expected distributions to represent the value of the general partner interest to SSC to be reasonable. We, therefore, conclude that Mr. Reilly's treatment of SSC's 10% general partner interest in SJTC was appropriate.

C. Tax-Affecting the Valuation of SSC

Mr. Reilly used the same methodology to tax-affect his valuation of SSC except that he used a different rate for the dividend tax avoided because his analysis of the implied benefit for SSC's shareholders in prior years yielded a different rate. We accept Mr. Reilly's method of tax-affecting the valuation of SSC for the same reasons we accepted it for the valuation of SJTC.

**[*49]** VI.  <u>Discount for Lack of Marketability</u>

The two experts are only 5% apart on marketability discounts.  Mr. Reilly applied to his weighted business enterprise value a 35% discount for lack of marketability, which he based on empirical studies of the discounts on transfers of restricted shares of publicly traded companies and on private transfers before initial public offerings (IPO).  Mr. Schwab determined a 30% discount for lack of marketability by analyzing the discounts applied in private sales of restricted stock.

Respondent contends that Mr. Reilly's 35% discount for lack of marketability was excessive and that he did not explain sufficiently how he arrived at the discount.  We disagree.  Mr. Reilly attached an appendix to his report in which he explained the reasoning behind the discount for lack of marketability.  In doing so, he explained in detail the common empirical models--studies on the sales of restricted stock and on private, pre-IPO sales of stock--and the two theoretical models--the option pricing model and the DCF model--summarizing the methodology and results of individual studies.  He then discussed the effect that restrictions on transferability have on a discount, as well as the other factors listed in <u>Mandelbaum v. Commissioner</u>, T.C. Memo. 1995-255, <u>aff'd</u>, 91 F.3d 124

**[\*50]** (3d Cir. 1996).[7] Mr. Reilly arrived at a 35% discount on the basis of the studies he previously discussed and on SJTC's unique characteristics, such as its Buy-Sell Agreement, its lack of historical transfers, a potentially indefinite holding period, its reported loss in the 12 months before to the valuation date, and the unpredictability of partner distributions.[8] We conclude that Mr. Reilly's discount was appropriate and adequately explained.

Mr. Schwab did not consider the restrictions on transferability in the SJTC Buy-Sell Agreement, and he conceded at trial that it would likely increase the discount by "something like 1%, 2%". Because Mr. Schwab was guessing at

---

[7] In Mandelbaum v. Commissioner, T.C. Memo. 1995-255, aff'd, 91 F.3d 124 (3d Cir. 1996), we examined our caselaw regarding marketability discounts and distilled 10 factors that we may consider in determining the appropriate discount: (1) the value of the company's privately traded stock relative to the value of its publicly traded stock; (2) an analysis of the company's financial statements; (3) the company's capacity to make distributions, its history of paying distributions, and amounts of prior distributions; (4) the nature of the company, its history, its position in its industry, and its economic outlook; (5) the company's management; (6) the degree of control conferred by the interest transferred; (7) restrictions on transferability; (8) the holding period required to realize a profit; (9) the company's redemption policy; and (10) the cost to make a public offering. See Estate of Gilford v. Commissioner, 88 T.C. 38 (1987); N. Tr. Co. v. Commissioner, 87 T.C. 349 (1986).

[8] Although Mr. Reilly arrived at a discount of 35% in his report, the appendix to his report says that he concluded a discount of 30%. It appears that his conclusion in the appendix is a typo. His calculations used a 35% rate.

**[*51]** changes to his discount during the trial to account for considerations that he left out, we conclude that the proper discount for lack of marketability was 35%.

VII. <u>Conclusion</u>

We summarize our conclusions as follows. First, we do not accept Mr. Schwab's NAV method for valuing SJTC because there was no likelihood of a sale of SJTC's timberlands and, thus, an asset-based approach was not appropriate for valuing SJTC. Second, we find that Mr. Reilly's use of the 2009 revised projections in his valuation of SJTC was proper. Third, we accept Mr. Reilly's tax-affecting in his valuations of SJTC and SSC as more accurate than respondent's blunt zero-rate approach. Fourth, we conclude that Mr. Reilly properly treated the intercompany loans from SSC to SJTC and SSC's 10% general partner interest in SJTC as operating assets. And finally, we find that Mr. Reilly's discount for lack of marketability was reasonable.

We therefore adopt the valuations in Mr. Reilly's report and find that the noncontrolling, nonmarketable values of the blocks given as gifts as of the valuation date were as follows:

| [*52]  Shares/units | Value per share/units | Value of block |
|---|---|---|
| SSC class A (voting) | $390 | $507,000 |
| SSC class B (nonvoting) 1 | 380 | 1,824,000 |
| SSC class B (nonvoting) 2 | 380 | 2,073,280 |
| SJTC limited partnership units | 380 | 3,901,715 |

Any contentions we have not addressed we deem irrelevant, moot, or meritless.

To reflect the foregoing,

Decision will be entered under Rule 155.